**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**DEVERICK SCOTT**                                                                **PLAINTIFF**
**ADC #131042**

**v.**                              **No: 5:19-cv-00079 BSM-PSH**

**JAMES PLUMMER**                                                       **DEFENDANT**

## PROPOSED FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following Recommendation has been sent to United States District Judge Brian S. Miller. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

### I. Introduction

Plaintiff Deverick Scott, an inmate at the Arkansas Division of Correction's Varner Supermax Unit, filed a *pro se* complaint (Doc. No. 2) and amended complaint (Doc. No. 6) pursuant to 42 U.S.C. § 1983. After screening Scott's amended

complaint, Scott's claims were limited to a First Amendment retaliation claim against defendant James Plummer.[1]  *See* Doc. Nos. 7 & 9.  Scott alleges that on May 17, 2018, Plummer refused to allow him to go to sick call, placed him on behavior control status, and issued him a disciplinary in retaliation for Scott refusing to snitch on another inmate and for Scott filing prison grievances and §1983 complaints against Plummer.  Doc. No. 6, *Amended Complaint,* at 8-10.  Scott sues Plummer in both his official and individual capacities[2] for compensatory and punitive damages.  *Id*. at 1 & 9.

Before the Court is Plummer's motion for summary judgment, brief-in-support, and statement of undisputed material facts (Doc. Nos. 43-45) as well as Scott's "motion for summary judgment in opposition," brief-in-support, and statement of undisputed facts (Doc. Nos. 47-49); Scott's statement of disputed material facts in response to Plummer's statement of facts (Doc. No. 50); and Plummer's response, brief-in-support, and response to Scott's statement of facts (Doc. Nos. 53-55).  For the reasons described herein, the undersigned recommends that Scott's motion for summary judgment be denied and Plummer's motion for summary judgment be granted.

---

[1] The Court did not construe Scott's complaint as setting forth an Eighth Amendment deliberate indifference claim against Plummer.  *See* Doc. Nos. 7 & 9.

[2] Plummer asserts that Scott did not specify the capacity in which he sues Plummer.  However, Scott indicated in the caption of his amended complaint that he sues the listed defendants in both their individual and official capacities.  *See* Doc. No. 6 at 1.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". FED. R. CIV. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is

genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

## III. Facts

In May 2018, Plummer worked as a shift Lieutenant at the Varner Supermax Unit. Doc. No. 43-9, *Declaration of James Plummer,* at ¶ 5. His duties included supervising the sergeants and daily operations; performing inmate and barracks searches and strip searches as needed; preparing and maintaining reports concerning inmate disturbances and injuries, including disciplinary actions; counseling the inmates; and attending shift briefings to discuss incidents, problems, security issues, and inspections during shift. *Id.* at ¶ 6.

On May 17, 2018, Scott was housed in a two-man cell with inmate Tony Brooks. Doc. No. 43-1, *Scott Deposition Testimony,* at 54. Around 1:45 a.m., officers Price and Pace escorted Scott, who was handcuffed, back to his cell from shower call. *Id.* at 51. When they arrived at the cell, Brooks was in the cell with no handcuffs on, sitting on the toilet, and reading a magazine. *Id.* at 51-52 & 58. According to Scott, Price placed him behind the bars of the cell, slammed the bars

to the cell, and said, "that's what I thought, you better not do nothing." *Id.* at 52-53. While Price was attempting to remove Scott's handcuffs, Scott pulled away from Price with the handcuffs still on and the key still in the handcuffs, and Brooks grabbed the key.[3] *Id.* at 53-54. Brooks unlocked and removed the handcuffs from Scott's wrists. *Id.* Neither Scott nor Brooks would return the key[4] and the officers reported the incident to Lt. Carlton Burchfield. *Id.* at 55-58.

According to Scott, Burchfield came to his cell between 2:30 and 3:00 a.m. and asked Brooks for the key. Doc. No. 43-1 at 60. Scott claims that Brooks put the handcuffs on the cell bars, and requested something in exchange for the key, but Burchfield simply took the handcuffs and left. *Id.* According to Plummer, Scott and Brooks were issued disciplinaries by Burchfield. Doc. No. 43-9 at ¶ 33. Scott denies that Brooks received a disciplinary. Doc. No. 50 at 4; Doc. No. 43-1 at 58.

According to Plummer, he arrived at the unit at 5:30 a.m. on May 17, 2018, and was informed that Scott and Brooks had taken a handcuff key from officer Price. Doc. No. 43-9 at ¶ 20. Plummer states that Scott and Brooks threatened the security

---

[3] Scott submitted an unsigned statement from Brooks stating that he took the key out of Scott's handcuffs on May 17, 2018. Doc. No. 48 at 29.

[4] Scott claims he told the officers that they would need to "buy" the key back. Doc. No. 43-1 at 54. He states he negotiated to return the key in exchange for one of the officers providing him some chicken. *Id.* However, after Scott received the chicken, he did not return the key, stating that Brooks had it. *Id.* at 54-55. Brooks then stated he wanted some "dude sticks" or K2 in exchange for the key. *Id.* at 55. The officers refused. *Id.* at 55 & 58.

and operations at the unit by taking the key, and it was his job as shift supervisor to assist the officers in retrieving the key from them.  *Id.* at ¶ ¶ 21 and 32.

According to Scott, Plummer had Scott and Brooks strip-searched and their cell searched.  Doc. No. 43-1 at 60-62.  Scott claims that while Brooks showed the officers the key before the search, they could not find it during the search.  *Id.* at 62.  As a result, they moved Scott and Brooks to separate showers.  *Id.*  According to Scott, Plummer and Major Carroll asked him where the key was, and he replied that he did not know and they should ask Brooks.  *Id.* at 63.  He claims that the officers asked him to snitch on Brooks but he refused.  *Id.* at 64.  Scott also asserts that while in the showers, officers were aware that Brooks had the key because he showed it to them.  *Id.*

According to Scott, while he was in the shower talking to Plummer and Major Carroll, Sergeants Ryas and Wallace arrived to take him to sick call.[5]  Doc. No. 43-1 at 64.  Scott claims that Plummer informed them that Scott was on **behavior control** and could not go to sick call.[6]  Doc. No. 43-1 at 64.  Plummer claims that he

---

[5] Between May 9 and May 15, 2018, Scott submitted three inmate requests seeking to have his nortriptyline prescription renewed.  Doc. No. 43-8*, Inmate Requests*, at 1-3.  In response to his requests, he was instructed to put in a sick call so he could be seen during sick call and have his prescription renewed.  *Id.* at 2-3; *see also* Doc. No. 43-1, *Scott Deposition Testimony,* at 44.

[6] Behavior control is a behavior modification status used to discourage an inmate's inappropriate behavior.  Doc. No. 43-9 at ¶ 12.  According to Administrative Directive 18-16, the ADC's Behavior Control Policy, an inmate may be placed on behavior control for any assaultive, disruptive, or self-injurious behavior and/or acts of sexual misconduct.

told Ryas and Wallace that "we were dealing with a **behavior control issue** and to

come back at a later time because we needed to locate the key." Doc. No. 43-9 at ¶

22. Plummer also claims that he did not know whether Scott or Brooks had the key

when Ryas and Wallace arrived to take Scott to sick call. *Id.* Finally, he explains

that, if Scott had the key and was allowed to go to sick call, Scott could have passed

the key off to another inmate. *Id.* at ¶ 23. Scott testified that because he was not

allowed to go to sick call on May 17, he was required to put in a new sick call request

to get his medication. Doc. No. 43-1 at 66.

Because Scott and Brooks refused to return the key, they were taken to

punitive isolation and placed in separate one-man cells. Doc. No. 43-9 at ¶ 24; *see

also* Doc. No. 43-1 at 65 & 69. Brooks gave the key to an officer that came on duty

during the next shift. Doc. No. 43-9 at ¶ 25.

Scott claims that in addition to being refused sick call, he received a

disciplinary and was placed on behavior control status related to this incident. Doc.

---

Doc. No. 43-10, *Administrative Directive 18-16.* The policy defines "disruptive
behavior" as behavior that threatens the security and/or operations of the facility,
encourages, incites a disruptive atmosphere, or creates a serious health hazard. *Id.* at 1.
To place an inmate on behavior control status, the conduct in issue must be well
documented by staff, recommended by the shift supervisor to the Duty Warden, and
"reflect that the use of other management tools to correct the documented behavior has
been ineffective . . . ." *Id.* at 2. An inmate on behavior control is placed in a cell with
only a blanket (no mattress), undergarments, a paper gown, and a small amount of toilet
paper. *Id.* All personal property is removed from the cell and no privileges are allowed.
*Id.* Only legal/privileged mail is delivered. *Id.* at 3. Staff is required to observe the
inmate at least every 30 minutes, and behavior control status remains in effect for 72
hours or less when behavior becomes acceptable. *Id.* at 3-4.

No. 49 at 2-3.  He claims that Brooks did not receive a disciplinary and was not placed on behavior control status.  *Id.*  Scott alleges that Plummer refused him sick call and treated him more severely than Brooks in retaliation for grievances and lawsuits he previously filed against Plummer.  *Id.*  He also asserts that Plummer placed him on behavior control status in retaliation for Scott's refusal to "snitch" on Brooks.  *Id.* at 2.  Finally, Scott claims that Plummer treated another inmate, Steven Cody-Obama, more favorably a couple of weeks after the May 17, 2018 incident.  *Id.* at 3.  He claims that Plummer did not place Cody-Obama on behavior control even though Cody-Obama escaped his cell and took pepper spray from the control booth.  *Id.*  Scott submits an affidavit by Cody-Obama describing this incident.  *See* Doc. No. 48 at 40.

In his deposition, Scott identified one lawsuit he had filed against Plummer before the May 17, 2018 incident:  *Scott v. Watson*, Case No. 5:14-cv-00346.[7]  Doc. No. 43-1, *Deposition Testimony of Deverick Scott,* at 13-14.  His claims against Plummer in that case were dismissed with prejudice.  Case No. 5:14-cv-00346 (Doc. No. 67).

---

[7] Court records indicate Scott filed one other lawsuit naming Plummer before the May 17, 2018 incident:  Case No. 5:17-cv-00272-JM-JJV.  His claims against Plummer were dismissed without prejudice for failure to exhaust administrative remedies.  *See* Doc. No. 63.

In the three months before the May 17, 2018 incident, Scott wrote four grievances naming Plummer: VSM18-0186, VSM18-1187, VSM18-1277, and VSM18-1298. Doc. Nos. 43-2, 43-3, 43-4 & 43-5. Each of these grievances was found to be without merit, and there is no indication corrective action was taken with respect to Plummer. *Id.* Scott also submitted one additional grievance naming Plummer before the May 17 incident. Doc. No. 48 at 53. In that unnumbered grievance, submitted on May 1, 2018, Scott alleged that numerous officers including Plummer retaliated against him for past grievances and lawsuits and failed to protect him from being dashed with urine by another inmate. *Id.* The staff response to that grievance stated that Scott had been moved and the issue was resolved. *Id.*

## IV. Analysis

### A. *Sovereign Immunity*

Plummer correctly asserts that Scott's monetary claims against him in his official capacity are barred by sovereign immunity.[8] A suit against a defendant in his or her official capacity is in essence a suit against the State of Arkansas, and any official capacity claim for monetary damages against that defendant is barred by the doctrine of sovereign immunity. *Will v. Michigan Department of State Police, et al.*, 491 U.S. 58, 71 (1989)*; Nix v. Norman*, 879 F.2d 429, 431-432 (8th Cir. 1989).

---

[8] Scott does not seek injunctive relief. Doc. No. 6 at 11.

Accordingly, the undersigned recommends that Plummer be awarded summary judgment with respect to Scott's official capacity claims.

## B.    *Qualified Immunity*

Plummer asserts he is entitled to qualified immunity with respect to Scott's individual capacity claims.  Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct.  *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).  Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To succeed on a § 1983 retaliation claim, a plaintiff must prove: (1) that he engaged in a protected activity; (2) that the government official took adverse action

against him that would chill a person of ordinary firmness from continuing the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020); *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013). Speculative and conclusory, or *de minimis* allegations cannot support a retaliation claim. *See Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam). A plaintiff must also prove a causal connection between the constitutionally protected activity and the adverse action. *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004). Temporal proximity between a protected activity and an adverse action "is relevant but not dispositive." *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) (citing *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999)).

The Court first considers whether Plummer is entitled to qualified immunity on Scott's claim that Plummer retaliated against him because he refused to snitch on Brooks. Plummer acknowledges that refusing to snitch may constitute protected activity. He argues, however, that even if a refusal to speak against another is considered protected, he is entitled to qualified immunity because it is not clearly established that an inmate has a constitutional right not to snitch on another inmate. *Cf. U.S. v. Paguio*, 114 F.3d 928, 930 (9th Cir. 1997) (finding no constitutional right not to snitch) with *Burns v. Maruscello*, 890 F.3d 77, 88-93 (2d Cir. 2018) (finding refusing to serve as a snitch on an ongoing basis is protected by the First

Amendment).  There is no Eighth Circuit precedent on this issue.  The Court finds that it is not clearly established that inmates have a First Amendment right not to snitch on other inmates.  Therefore, Plummer is entitled to qualified immunity on Scott's claim that Plummer retaliated against him for not snitching on Brooks.

As to Scott's remaining claims, Plummer does not dispute that Scott engaged in protected activity by filing lawsuits and grievances.  Doc. No. 44 at 9.  *See also Spencer*, 738 F.3d at 911-913.  Instead, Plummer argues that his refusal to allow Scott to go to sick call, and his treatment of Scott during the incident, would not chill a person of ordinary firmness from continuing to file lawsuits or using the prison's grievance procedures.

"The ordinary-firmness test is designed to weed out trivial matters from substantial violations of the First Amendment."  *Gonzalez*, 971 F.3d at 744 (citing *Santiago*, 707 at 992).  "'The test is an objective one, not subjective. The question is.... [w]hat would a person of 'ordinary firmness' have done in reaction to the [adverse action]?'" *Id.* (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)).  While the test is an objective one, "how the plaintiff acted might be evidence of what a reasonable person would have done."  *Garcia*, 348 F.3d at 729. See *Gonzalez*, 971 F.3d at 745 (considering plaintiff's actions in response to the alleged retaliation as evidence of what a person of ordinary firmness would have done and affirming grant of summary judgment); *Naucke v. City of Park Hills*, 284

F.3d 923, 928 (8th Cir. 2002) (noting that plaintiff continued to exercise her First Amendment rights despite the retaliatory acts of the defendants).

In asserting that a person of ordinary firmness would not be chilled from continuing to file lawsuits or grievances in this matter, Plummer offers evidence that Scott continued to file grievances and lawsuits after the May 17, 2018 incident. Two days after the May 17, 2018 incident, Scott filed a grievance, VSM18-1391, against Plummer. *See* Doc. No. 43-14. According to Court records, Scott has filed eleven lawsuits since the incident, not including this one: *Scott v. Gibson*, *et al.,* Case No. 5:18-cv-00150-JM (filed June 8, 2018); *Scott v. Kelley, et al.*, Case No. 5:18-cv-00190-KGB (filed July 19, 2018); *Scott v. Gibson*, *et al.,* Case No. 5:19-cv-00063-DPM (filed February 11, 2019); *Scott v. Cook*, *et al.,* Case No. 5:19-cv-00101-DPM (filed March 20, 2019); *Scott v. Gibson*, *et al.,* Case No. 5:19-cv-00280-JM-PSH (filed August 28, 2019); *Scott v. Correct Care Solutions, et al.,* Case No. 4:19-cv-00859-JM-JTK (filed December 3, 2019); *Scott v. Payne, et al.,* Case No. 4:20-cv-00077-KGB-BD (filed January 21, 2020); *Scott v. Payne, et al.,* Case No. 4:20-cv-00092-DPM-PSH (filed January 23, 2020); *Scott v. Payne, et al.,* Case No. 4:20-cv-00315-SWW (filed March 25, 2020); *Scott v. Gibson, et al.,* Case No. 4:20-cv-01487-KGB-JVV (filed December 23, 2020); and *Scott v. Arkansas Department of Correction, et al.,* Case No. 4:21-cv-00055-BRW-JVV (filed January 21, 2021). Scott named Plummer as a defendant in the six cases most recently filed. The Court

has considered Scott's actions in continuing to file grievances and lawsuits after the events of May 17, 2018 as evidence of what a person of ordinary firmness might do. Under all of the circumstances presented, the Court finds the alleged retaliatory actions taken against Scott would not chill a person of ordinary firmness from continuing to exercise his First Amendment rights.  Plummer is entitled to summary judgment for that reason.

However, even if the Court found that an ordinary person's actions would have been chilled in the circumstances presented in this case, Scott has failed to establish that the alleged adverse action was motivated at least in part by the exercise of the protected activity.  Simply put, Scott has not provided any evidence that Plummer acted with a retaliatory motive.  To succeed on a retaliation claim, a plaintiff must provide affirmative evidence of a retaliatory motive.  *See Haynes v. Stephenson,* 588 F.3d 1152, 1157 (8th Cir. 2009); *see also Wilson*, 441 F.3d at 592 ("[Plaintiff's] belief that [defendant] acted from a retaliatory motive is insufficient.").  The prior lawsuits Scott filed against Plummer were filed in 2014 and 2017, well before May 17, 2018.  And the only relationship between the four grievances Scott filed against Plummer in the three months before the incident and the incident itself is a temporal one.  There is no evidence that any action was taken against Plummer in response to the lawsuits or grievances filed by Scott.  Scott's claims against Plummer were dismissed in both lawsuits and all of Scott's grievances

were found to be without merit. The temporal relationship between the grievances/complaints and the incident, without more, fails to establish a retaliatory motive. And Scott has failed to provide "more."

Instead, the undisputed facts establish that Plummer's actions on the morning of May 17, 2018, were taken in response to a security issue. Scott does not dispute that Brooks took the handcuff key out of Scott's handcuffs; that Scott and Brooks negotiated with prison officers for the return of the key, but refused to return it; that after Scott and Brooks' bodies and cell were searched, the key was not recovered; that Scott and Brooks were subsequently placed in separate showers and then taken to punitive isolation where they were placed in separate cells; that the key was not recovered until after Scott and Brooks were placed in punitive isolation; or, finally, that an inmate's possession of a handcuff key presents legitimate issues of safety and security. It is clear to the Court that Scott and Brooks were playing games with prison staff.

Plummer says he did not know whether Scott or Brooks had the key when Ryas and Wallace arrived to take Scott to sick call. Scott maintains that Plummer knew Brooks had the key – he claims that Brooks showed Plummer the key while in a separate shower. Thus, according to Scott, there was no need to deprive him of sick call because he could not pass off to someone else a key he did not possess, and Plummer must have had a retaliatory motive. Scott fails to create a genuine dispute

about whether Plummer knew Brooks had the key.  Scott does not claim to have witnessed Brooks showing the key to Plummer in the shower.  Brooks, in his unsigned affidavit, does not claim that he showed Plummer the key when he was in the shower.  It is undisputed that Scott and Brooks were in separate showers, and Plummer was with Scott.  Scott's claim that Plummer knew Brooks had the key while in the shower is purely speculative.[9]

Additionally, even if Plummer knew that Brooks had the key, he was certainly within his rights to refuse to release Scott for sick call.  Scott was not ill and did not claim to be.  The sick call was to renew a prescription, and could be (and was) rescheduled.  Plummer was in the midst of an investigation that presented a serious safety and security issue.  The parties involved had refused to return the handcuff key for hours, and played games with prison officials about the return of the key.  There was no medical emergency present.  The safety and security issue presented outweighed the need for Scott to get his prescription refilled at that moment.  The

---

[9] Scott complains that video evidence would show that Brooks showed Plummer the key.  Doc. No. 50 at 3.  The Court notes that Scott sought production of this video evidence and a default judgment because the video had been erased.  *See* Doc. No. 24 & 34.  According to a declaration from Warden James Gibson, the Varner Unit's camera system automatically erases all security recordings if the recording has not been tagged and recorded on a disc.  *See* Doc. No. 38-5.  Scott's complaint was filed long after the video footage was erased.  There is no evidence that would support a spoliation claim under these circumstances.

actions of Scott and Brooks were solely responsible for Scott not being allowed to go to sick call.

Scott also claims that Plummer acted with a retaliatory motive because Brooks received less severe discipline than Scott did, although they engaged in the same behavior. Specifically, Scott received a disciplinary and claims Plummer placed him on behavior control, while Brooks received neither consequence. Scott's claims are speculative and without merit.

Plummer has testified that both Scott and Brooks received disciplinaries. Doc. No. 43-9 at 5. Brooks' unsigned affidavit does not claim otherwise. And Scott has provided no evidence to refute Plummer's testimony.[10] Further, the Court notes that the disciplinaries were issued by Burchfield, not Plummer. Burchfield is not a party to this action. And even assuming Brooks did not receive a disciplinary, there is no evidence that Plummer had any involvement in Burchfield's decision regarding who should receive a disciplinary.

Scott also claims that Plummer placed him, but not Brooks, on behavior control status to retaliate against him for filing grievances and lawsuits against

_____

[10] The Court anticipates that Scott may claim he was prevented from obtaining evidence to refute Plummer's testimony. Scott claims that his discovery requests to Plummer asked if Brooks had been written a disciplinary and requested the production of Brooks' disciplinary, and Plummer objected. Doc. No. 50 at 4; Doc. No. 49 at 4. A review of Scott's discovery requests establishes that he did **not** ask Plummer if Brooks had been written a disciplinary and he did **not** request production of any disciplinary issued to Brooks. *See* Doc. No. 48 at 12-16; Doc. No. 24 at 3-8.

Plummer. Doc. No. 49 at 2-3. The Court recognizes that behavior control status is more restrictive than punitive isolation or segregation. Plummer has testified that he placed Scott on behavior control status on May 11, 2018, 6 days **before** this incident, after Scott refused to move from his cell, attempted to stab Plummer and Ryas with a pointed metal object, and attempted to block his trap. Doc. No. 43-9 at 2. According to Plummer, he removed Scott from behavior control status on May 14, 2018. *Id.* at 3. On May 17, 2018, when he was advised that Scott and Brooks had taken and refused to return a handcuff key, Plummer moved Scott and Brooks to punitive isolation and placed them in single man cells.[11] *Id.* at 4.

In responses to discovery requests, Plummer stated that Scott was not placed on behavior control on May 17. Doc. No. 24 at 3. Plummer provided a Job/Program Assignments document in support of his response. Doc. No. 48 at 41. It appears to document that Scott was placed on behavior control status on May 11, consistent with Plummer's testimony, and that Scott was not on behavior control status on May 17.

Scott claims that Plummer told the sergeants who came to take him to sick call that Scott was on behavior control, while Plummer states he told them that he

---

[11] ADC Administrative Directive 1-31 permits the placement of an inmate in restrictive housing when his continued presence in the general population poses a clear threat to the safe and secure operations of the facility. Doc. No. 43-9 at 4. Administrative Regulation 836 provides that an inmate may be confined to segregation/punitive isolation if he poses a threat to the security of the unit. *Id.* at 5.

was dealing with a behavior control issue.  Scott points to documents that reference him being placed on behavior control status – *i.e.*, a grievance response stated he was not taken to sick call because he was on behavior control; a property form indicated he was on behavior control on May 17.  Doc. No. 48 at 2-3, 18 & 27.

The Court finds any dispute concerning whether Scott was officially placed on behavior control status to be immaterial because Scott has failed to provide evidence that he was treated differently than Brooks.  The unsigned affidavit of Brooks does not address whether he was placed on behavior control status.  Scott argues that he cannot provide evidence of how Brooks was treated because he was prevented from obtaining it in discovery.[12]  This argument should fail.  Scott did seek discovery from Plummer regarding whether Brooks was placed on behavior control status, and Plummer objected to producing such information. Doc. No. 48 at 12-13.  Specifically, Plummer's objection stated that "[b]ehavior control information regarding inmate T. Brooks cannot be disclosed to another inmate due to security concerns."  *Id.* at 13.  Scott moved to compel, and the Court denied the motion because Scott did not claim to have attempted to confer with Plummer before filing the motion.  Doc. Nos. 24, 25.  Scott did not move again to compel this discovery, although he certainly could have done so after conferring with Plummer as required

---

[12] The Court notes that Scott was able to obtain an affidavit, albeit unsigned, from Brooks about other matters, yet did not obtain testimony from Brooks about this issue.

by the Federal Rules of Civil Procedure. Scott's status as a *pro se* litigant does not confer on him the right to disregard the Federal Rules of Civil Procedure. *See Bennett v. Dr Pepper/Seven Up, Inc.,* 295 F.3d 805, 808 (8th Cir. 2002).

For his final argument, Scott claims that another inmate, Steven Cody-Obama, took pepper spray from a control booth on May 31, 2018, but was not placed on behavior control. Doc. No. 49 at 3. He offers this argument, presumably, as evidence of Plummer's retaliatory motive in that he was treated more harshly on May 17 than Cody-Obama was on May 31. Scott submitted an affidavit signed by Cody-Obama stating that he took the pepper spray, held it in his cell for hours, and then voluntarily gave it to Plummer. Doc. No. 48 at 40. Cody-Obama states "I was asked if I/M Scott, D. wanted me to come get him out of his cell b/c they state they are 'laying to get him due to his lawsuits.'" *Id.* Cody-Obama does not identify who purportedly made this statement. The Court finds that whatever may have happened to Cody-Obama on May 31 has no relevance to whether Plummer acted with retaliatory motive on May 17, 2018.

In sum, Scott merely speculates that Plummer prevented him from going to sick call on May 17, 2018, or treated him more severely than he treated Brooks or Cody-Obama, in retaliation for filing past lawsuits and grievances. There is no evidence to tie those lawsuits or grievances to the May 17, 2018 incident, and there is no evidence that Plummer's actions that day were motivated by retaliation instead

of legitimate security concerns. Summary judgment should be granted, and Plummer is entitled to qualified immunity because Scott cannot establish that Plummer violated his constitutional rights.

## V.  Conclusion

For the reasons stated herein, the undersigned recommends:

1.    Scott's motion for summary judgment (Doc. No. 47) be denied;

2.    Plummer's motion for summary judgment (Doc. No. 43) be granted;

3.    Scott's claims be dismissed with prejudice.

DATED this 4th day of February, 2021.

_____

UNITED STATES MAGISTRATE JUDGE